# MARYLAND REPORTS.

## JUNE TERM, A. D., 1858.

## TALMADGE F. CHERRY vs. MYER STEIN and others.

Certain property, consisting of an *entire square* in the city of Baltimore, was *advertised* for sale at public auction, and if not sold *together* that a part would be sold in *lots* described in the advertisement. Before the sale a *private contract*, in writing, was made between the vendor and a purchaser, stating that the latter had *purchased* one of these lots, a *description* of which is given *in the contract;* and that "*this sale* was to be null and void in case the whole square, as advertised, shall be sold together, otherwise to remain in *full force.*" On the day of sale an unsuccessful attempt was made to sell the whole square, and then the different *lots*, as advertised, were sold to different persons; the lot which the purchaser above named had agreed to purchase being struck off to him at the same price he had agreed to pay for it by his *private contract.* There was a discrepancy between the description of this lot in the *advertisement* and that in the *private contract*, the former *including* and the latter *excluding* a small triangular piece of ground, which was also included in the description of another lot sold to a different party. HELD:

That the unsuccessful attempt to sell the *whole square* at public sale, left the *private agreement* in *full force*, and this was the *actual contract of sale* between the parties, and the purchaser took according to the *description* in *this contract*, and not according to that in the *advertisement.*

Where there are *two contracts* of sale from the *same party* to two purchasers, made the *same day* and with only a few minutes intervening, and *both* include the disputed property, still the *first purchaser* acquires the *better title.*

Exceptions or objections to testimony, taken before a justice of the peace, by order of court, made *before such justice*, are not sufficient unless *regularly filed* in court, and on appeal such testimony is before the *appellate court*, even though it would have been excluded by exceptions properly filed.

1. v. 11

The modern English doctrine sustaining the right to *ancient lights and windows*, based upon *twenty years* user of them, is *not applicable* in this State; to adopt it would greatly interfere with and impede the rapid changes and improvements constantly going on in our cities and villages.

The doctrine, that the owner of two adjacent lots, one *vacant* and the other having a building with *overlooking lights*, who sells the *latter* without reserving the right to build on the vacant lot, or stop such lights, cannot afterwards legally obstruct them, or convey to another the right to do it, is *only* applicable where the *same party* is, at the *time of sale*, *owner of both lots*.

Where a party builds a house on the line of his lot, with *eaves projecting over* the adjoining lot, so as to throw thereon the water from the roof, it is a *manifest* encroachment upon, and appropriation of such lot, to the extent, at least, of the projection, and *twenty years acquiescence* by the owner of the adjacent lot, in this encroachment, is sufficient to lay the foundation for presuming a *grant* of the right so to use it.

But *an injunction* to prevent the obstruction of such a right will be dissolved, unless, it clearly appears, by the proof, that such obstruction would inflict, upon the rights of the complainant, an important and *irreparable* injury, such as could not be fully compensated by an action at law.

It must be a strong case of trespass going to the destruction of the inheritance, or the mischief be remediless, to entitle the party to an injunction; this writ is only used to protect rights which are clear, or, at least, free from reasonable doubt.

APPEAL from the Circuit Court for Baltimore city.

This is an appeal from an order of the court below, (KREBS, J.,) dissolving an injunction which had been granted upon a bill filed by the appellant against the appellees. The allegations of the bill and answer, and the proof in the case, are fully stated in the opinion of this court.

The cause was argued before LE GRAND, C. J., ECCLE-STON and TUCK, J.

*H. L. Bond* and *Milton Whitney* for the appellant, argued:

1st. The only question of *fact* in the case is, did the complainant *purchase* the small triangular lot described in the proceedings and marked yellow upon the plat? We insist that he did, and that the evidence in the cause proves it. The limits of lot No. 1, sold to the complainant, *as described in the advertisement*, unquestionably include this triangle. It is also

included in lot No. 4, sold to Hurst and by him assigned to the defendants, as that lot is described in the *certificate* of sale given by Fite to Hurst. The evidence shows that the property was *advertised* for sale by Fite, as administrator; that lot No. 1, on the day of sale, was sold by the auctioneer to the complainant after reading the *printed advertisement;* that no plat was exhibited at the sale; that Fite, as agent of the other owners, and as administrator, had full power to divide the whole property as he thought fit, and sell the same upon such terms as he chose; and that the sale of lot No. 4 to Hurst was *subsequent* to that of lot No. 1 to the complainant. The sale to the complainant being *prior* to that to Hurst gave to him the triangle in dispute. 17 *Penn. State Rep.*, 222, *Maynard vs. Esher.* 9 *Bing.*, 305, *Swansborough vs. Coventry* in 23 *Eng. C. L. Rep.*, 286. 5 *Md. Rep.*, 323, *Moale vs. Mayor & C. C. of Balto.*

Prior to the sale at auction, Gist, as agent of both Fite and the complainant, arranged the terms upon which the purchase money was to be paid, and the agreement was signed by the latter, and is filed in the cause as defendants' exhibit "*S. No. 1.*" This agreement, we insist, *had nothing to do with* the *boundaries* of lot No. 1, it being understood that the lot sold to the complainant, mentioned therein, was the corner lot *advertised for sale,* and that the sale was *according to the description in the advertisement.* The title to this disputed lot being in the complainant, the first matter of complaint against the defendants, viz., the excavation of this lot and building the side wall of their warehouse thereon, is well founded.

2nd. That the sale to the complainant carried with the lot all the easements claimed by the bill in this case, even though the disputed triangle was not included in that sale and the lines of the complainant's lot were bounded by the improvements. The sale was made by the agent of the owners of all the property, was made *before* the sale to Hurst, and the drainage of water and location of the windows on the complainant's lot were apparent and known to Hurst, from whom the defendants purchased, and to the defendants themselves after their purchase. These easements claimed by the bill,

upon which we now insist, and which the defendants, by their excavations and the erection of their wall are obstructing, and of which obstruction we complain, and to prevent which we had a right to an injunction, are, 1st. Certain ancient lights and windows in the back building upon the complainant's lot, which had been used free of any obstruction for more than twenty years, and which the defendant's wall, when finished, will effectually shut up, darken and render utterly useless. In support of our right to this easement, we contend, 1st, that the doctrine of ancient lights is clearly established by the English decisions and should be sustained in this State; and 2nd, that if this doctrine of ancient lights should be regarded as inapplicable here, we still insist, that when these adjoining lots, Nos. 1 and 4, were sold by Fite, the lights in question were open and apparent, and if the owner of two adjoining lots, one of which is *vacant*, and the other has a building upon it, with lights overlooking the former, sells the *latter*, without any exception or reservation of a right to build on the vacant lot, or to stop the lights in the building sold by him, he cannot afterwards lawfully obstruct those lights himself, nor can he convey to another the right to do it. 2nd. The second easement claimed by the bill is, that for more than forty years prior to the sale, the *eaves* and *roof* of the back building on the complainant's lot had projected over the disputed triangle, and the water falling upon the roof had been accustomed to run and drain over this triangle and the vacant lot adjacent thereto. This easement is clearly recognised by all the authorities, and the bill alleges and the proof shows, that the defendants' wall, if carried up as designed, would interfere with and prevent the projection of the eaves and roof and the drainage of water therefrom, to the great damage of the complainant's lot, buildings and improvements. In support of our views upon these points we refer to the following authorities: 1 *Green's Ch. Rep.*, 57, *Robeson vs. Pittenger*. 1 *Sumner*, 492, *United States vs. Appleton*. 3 *New Hamp.*, 190, *New Ipswich Factory vs. Batchelder*. 3 *Mason*, 272, *Hazard vs. Robinson*. 1 *Rhode Island Rep.*, 417, *Kenyon vs. Nichols*. 12 *Mass.*, 160, *Story vs. Odin*. 5 *H. & J.*, 467,

*Wright vs. Freeman.* 13 *Wend.,* 261, *Mahan vs. Brown.* 4 *Sandford's Ch. Rep.,* 464, *Banks vs. American Tract Society.* 13 *New Hamp.,* 360, *Watkins vs. Best. Gale &· Whateley Law of Easements,* 38.

3rd. That an injunction was the proper remedy in this case. The allegations of the bill come within the decisions of this court as to what injuries will be stayed by injunction, and it must be borne in mind that the ground for the injunction is not for the trespass in digging the lot, but on that *and* the obstruction of the lights, and the drainage and flowage of the water from the eaves and roof of the building upon the complainant's lot. 1 *Md. Rep.,* 539, *White vs. Flannigain.* 7 *Do.,* 408, *Shipley vs. Ritter.* 1 *Md. Ch. Dec.,* 37, *Georges Creek Co. vs. Detmold.* 3 *Do.,* 499, *Carlisle vs. Stevenson.*

*William F. Frick* for the appellees, argued:

1st. That the injunction was rightfully dissolved so far as it restrains the defendants from erecting their wall upon the triangular lot claimed by the complainant, and which is the *first* matter of complaint in the bill, because, 1st. The title to this triangle was not in the complainant. Fite was the agent of all the owners to divide and sell the lots. He *included* this triangle in the sale to Hurst, from whom the defendants claim, and *excluded* it from that to the complainant. The complainant can only claim through the written agreement "S., No. 1," and not through the auction sale, which was virtually *on his account.* The advertised terms of sale were varied by that written agreement. The lots were sold by lines running "more or less," and *"according to the improvements as they stood."* Whatever the complainant may have supposed, Fite never intended to sell him this triangle. He *clearly* sold it to the defendants, and if the complainant has been deceived by his written agreement with Fite, his remedy is against Fite, and not against the defendants. In fact the complainant *has admitted title in the defendants,* and made that fact the ground of resistance to Fite's claim against him for the purchase money, in his answer in the case of *Fite vs. Cherry,* the re-

Cherry *vs.* Stein, *et al.*

cord in which is, by agreement, evidence here. 2nd. The complainant must show an *undoubted* title to the triangle. He has not done so. His title is disputed on good ground by the defendants. The question between them, if there be any, can and must be tried at law, by trespass or ejectment. His remedy there is complete and perfect. It is a pure question of title. There is no ground to support equitable jurisdiction in the case. No *irreparable* or special damage of any sort is alleged in the bill, nor is any proved, nor can any be conceived, growing out of the title and possession claimed and taken by the defendants. If the complainant puts himself on the ground (not, however, admitted to be tenable) of right to equitable relief, because his *title is purely equitable*, the answer is, that he does not claim such title by his bill. He claims *to have paid the entire purchase money and to be in possession,* either already holding or with an immediate right to the *legal title.* There is no averment in the bill, or proof to raise any special equity in favor of the complainant, or to show that his relief at law is not ample. 9 *G. & J.,* 468, Amelung *vs.* Seekamp. 4 *Gill,* 34, *Hamilton vs. Ely.* 3 *Md. Rep.,* 490, *Ches. & Ohio Canal Co. vs. Young.* 1 *Do.,* 525, *White vs. Flannigain. Brown on Actions at Law,* 389, 390, in 45 *Law Lib.* 110.

2nd. The second head of complaint is the obstruction and shutting up of certain *ancient* lights, so called, in the back-building on the complainant's lot. Upon this head it is contended, 1st. That to be an *ancient* light it must be, as averred in the bill, *more than forty years old,* which averment is not proved. *Cro. Eliz.,* 118, *Bury vs. Pope.* 2nd. That to bring the case within the *modern* English doctrine of the presumption of a grant from twenty years adversary enjoyment, the possession must be adverse to the *owners,* not the *tenants.* The knowledge of, and acquiescence in, the right claimed, must be that of the owner. The *permission* of the tenant, as in other cases of easements, as ways, commons, &c., is not sufficient. Both these lots have been, for more than twenty years, in the possession of *tenants.* 11 *East.,* 372, *Daniel vs. North.* 1 *Crabb's Real. Prop.,* sec. 453. 3rd. And even if the case can be brought within the *English* rule, such ought

not to be at all, and is not generally, the rule in this country. The modern English doctrine is not reasonably applicable to our rapidly growing towns and cities, and especially to the constantly improving thoroughfares of the latter. The rule has been expressly repudiated in New York and some other States, and though never yet considered by this court, has been rejected, after full examination, by the late *Chief Justice Archer* and his associate, *R. B. Magruder,* in the case of *Smith vs. White,* in Baltimore county court; and in their opinion, in that case, they adopt the law of *Parker vs. Foote,* 19 *Wend.,* 309, and regard the language of *Judge Dorsey,* in 5 *H. & J.,* 477, *Wright vs. Freeman,* as an *obiter dictum,* and not, therefore, of binding authority. See also 3 *Kent's Com.,* 448. 13 *Wend.,* 261, *Mahan vs. Brown.* 10 *Barb.,* 537, *Myers vs. Gemmel.* 26 *Maine,* 436, *Pierre vs. Fernald.* 2 *Conn.,* 597, *Ingraham vs. Hutchinson.* 5 *Richardson,* 311, *Napier vs. Bulwinkle.* 2 *Watts,* 331, *Hoy vs. Sterrett.* 4th. The complainant, by his bill, having put his claim on the ground of prescription, the averment being that the windows are more than forty years old, cannot, by proof, alter his case so as to make it one of an *implied grant* by Fite, the vendor, of the windows as necessary appurtenances to the lot, so as to bring himself within the principle asserted in *Story vs. Odin,* 12 *Mass.,* 157. And even if he could, the principle of that case, "that one cannot derogate from his own grant," applies only where the owner of the house, to which the lights are claimed to be appurtenant, is also, at the time of the sale, the owner of the adjoining vacant lot. 1 *Crabb's Real Prop., sec.* 465. Also the implied servitude must be created by all the owners if there be more than one. One tenant in common cannot establish it on the common property without the consent of the co-tenants. 3 *Kent's Com.,* 436. In this case there were different owners of the two lots. They were owned by the same family, but each by different persons. Further, the implication of a grant in such a case is founded on certain presumptions which are liable to be rebutted. They *are* here clearly rebutted by the *nature* of the property, the *circumstances* of the sale, the acts and declarations of Fite, the agent

to sell, and of the complainant and Hurst, the purchasers. The defendants' lot was sold to be *improved*, with which a grant of the windows in the complainant's lot was clearly irreconcilable. Fite supposed *both* lots were to be improved. The complainant *had notice of this* and did not then presume to claim the lights. 1 *Crabb's Real Prop.*, sec. 446. 1 *Price*, 27, *Compton vs. Richards.* The grant must be without reservation or exception of a right to build on the adjoining ground, (12 *Mass.*, 163,) and if the New York law is accepted as the true doctrine, the *implication* in question cannot arise in the sale of city lots. The grant must be *express*. 5th. Even if the defendants had no right to obstruct the windows by their building, *it is no case for an injunction.* The bill does not allege *irreparable* damage, nor any facts from which it may be inferred, nor are any proved. *The proof is exactly the opposite.* A mere diminution of the value of property by a nuisance, furnishes no ground for equitable relief. 2 *Kent's Com.*, 925, and cases in *note* 4. The mischief does not reach to the substance and value of the property itself, and go to the destruction of it in the character in which it is enjoyed. It is not shown there was no other *reasonably convenient* mode of lighting the room in question. The injury did not operate to destroy or diminish the comfort and use of the room. The proof shows it to be a *one story* room, capable, with perfect convenience, of being lighted either by the original windows on Liberty street, or by a sky-light. *In fact this latter was done.* It is hardly possible to conceive a case so barren of any claim to *equitable interference.* It is questionable whether there has been any damage at all, but certainly, if any, it is capable of perfect compensation at law. 2 *Eden on Injunctions*, 269, and *notes.* 1 *Md. Rep.*, 525, *White vs. Flannigain.* 9 *G. & J.*, 468, *Amelung vs. Seekamp.* 4 *Gill*, 34, *Hamilton vs. Ely.* 1 *Crabb's Real Prop.*, sec. 475. 16 *Ves.*, 338, *Attorney General vs. Nichol.*

3rd. The third ground of complaint is, interference with the eaves of the back building and drainage of its roof upon the adjacent lot. The same principles of law set forth under the preceding point apply equally to this. It may be further re-

marked, 1st. That there is no proof of the existence of any particular mode or channel of drip as appurtenant to the complainant's back building. 2nd. That there is no proof of any actual or proposed interference with the eaves of his roof. 3rd. That the water is capable, with entire convenience, of being thrown into Liberty street, as is clearly shown by the proof of the witnesses, one of the complainant's *own witness* and a *tenant* of the property for *twenty-seven years.* This whole matter, however, is finally put to rest here by the agreement of the solicitors for both parties, that the judge below should make a *personal inspection* of the premises, and both parties are bound by his judgment *on that view.* He says, in his opinion: "In regard to the right claimed by the complainant to drain the water from the roofs of these houses, I am convinced, from an inspection of these premises, which I have made at the request of the solicitors of both parties to this cause, that the hardship of denying it to him is by no means very serious, as the rain-water can be conducted, even from the roofs of the old buildings now standing on his lot, with very little inconvenience and expense, into Liberty street. I also find, that the only building on them having eaves projecting over this adjoining lot, is what is called the "old kitchen;" and further, that the wall, which the defendants are now engaged in building, will not come in contact with the rear wall of that part of his back building, but at one end of it will be eleven inches from it, and at the other seven inches, and consequently will not come in contact with the eaves which project over this wall except for a small part of their length, and in regard to this part, I understand that it is not intended that the wall which the defendants are building shall interfere with it."

ECCLESTON, J., delivered the opinion of this court.

This bill filed on the 11th of September 1854, by the present appellant, (Cherry,) against the appellee, alleges, that Conrad Reineker departed this life possessed of certain leasehold estate in the city of Baltimore, and that, in 1853, letters of administration on his estate were granted, by the orphans court of said city, to Conrad R Fite. That he, as administrator of said

Reineker, "advertised for sale at public auction, on the twentieth day of April 1854, in the public newspapers published in said city, the following described lot and premises: all that lot of ground on the south-east corner of Baltimore and Liberty streets, eighteen and one-half feet front on Baltimore street by seventy-three feet on Liberty street, widening on Liberty street to thirty-five feet, occupied by Schwartz & Dix, confectioners; and that at said sale the said lot and improvements thereon were sold by the said administrator," to the complainant, for the sum of $20,000; that the complainant hath satisfied the said Fite the purchase money, and hath been put in possession of said lot and premises. The bill also states, "that the improvements on said lot consist of a three-story brick house on Baltimore street, fronting thereon eighteen and one-half feet, and extending about thirty-two feet, the rear wall of which said house is about thirty-four feet in width; and also a back building adjacent to said house, fronting toward Liberty street, leaving in the rear of said back building a portion of said lot in said advertisement mentioned, and sold to the complainant as aforesaid, of about four feet in width on its widest point, and narrowing to a point at the north-east intersection of the wall of said back building, with the wall of the building on Baltimore street."

The bill likewise alleges, that there were in the rear wall of the back building certain windows and lights which opened upon that portion of the lot sold to the complainant and described as situate in the rear of the back building, the same being a triangle four feet wide at the widest point; adjacent to which open triangle there was also, at the time of the sale, an open lot then in possession of said administrator. That the said back building and the windows and lights therein have been standing and used for above forty years, without let or hindrance; and that for the space of forty years the eaves and roof of said back building have projected over the said portion of the complainant's lot four feet wide, and the water falling on said roof has been accustomed to run and drain over said four feet lot and the vacant lot adjacent thereto.

The bill then charges, that the defendants wrongfully, and

to the great injury and damage of the complainant, having dug away the entire portion of his lot in the rear of the back building to the depth of several feet, are proceeding to lay the foundation of a wall thereon, and are now actually engaged in building said wall in contact with the rear wall of the complainant's back building, which wall being so erected, besides depriving him of a strip of the lot sold by Fite to him as aforesaid, will effectually stop up and darken and render useless the lights and windows of the back building aforesaid, and will prevent the projection of the complainant's eaves and roof over his said lot, and the consequent drainage of the water therefrom, as the defendant's have no right to do, to the great damage and injury to the complainant's lot, building and improvements.

The bill prays that the defendants may be restrained, by injunction, from digging away, or upon, the portion of the complainant's lot in the rear of his back building, and from building their said wall thereon, and also from erecting said wall so as to darken and shut up the windows and lights in said back building; and from disturbing, removing, or any wise interfering with, the eaves and roof of the same, or with the full drainage of the water therefrom over the said lot in the rear of the back building, or over the vacant lot adjacent thereto. And there is a prayer for general relief also.

A portion of the bill charges the defendants with doing injury to the north-east corner of the complainant's house on Baltimore street, by digging with a view of making a vault, but his counsel have abandoned all claim to relief for any injury to this portion of the property, and therefore the subject is not now before us for consideration.

With a view of describing the lot alleged to have been purchased by the complainant, he filed with the bill a plat as his "Exhibit A."

The answer of all the defendants, (Myer Stein, Samuel Stein, Daniel Stein, Solomon Stein, Henry R. Reynolds and J. Reynolds,) admits, that Conrad R. Fite advertised for sale, on the 20th of April 1854, the lot and improvements on the south-east corner of Baltimore and Liberty streets, occupied by

Schwartz & Dix, confectioners; and that the complainant purchased the same for the sum of $20,000. But the circumstances of the purchase, as the defendants have been given to understand and believe, were, that Conrad R. Fite, as part owner and agent for the other owners of the entire property, advertised for sale the property on Baltimore street, bounded by Sharp, Baltimore and Liberty streets, well known as the old "Congress Hall," there being upon the Baltimore street front three buildings adjoining each other: the most westerly occupied by Schwartz & Dix, the central building by Obandoff & Lauer, and the most easterly by John Gephart, Jr. And prior to the offering of said property at public auction, the complainant agreed with said Conrad R. Fite, to purchase "the lot and improvements on the south-east corner of Baltimore and Liberty streets, occupied by Schwartz & Dix, fronting on Baltimore street 18½ feet, more or less, by 73 feet, more or less; on South Liberty street," for *the sum of twenty thousand dollars*, the condition of said purchase being, that the same should be "null and void in case the whole square, as advertised, should be sold together, otherwise to remain in full force."

With the answer, and as part thereof, the defendants filed a copy of the written agreement between the complainant and C. R. Fite, in reference to the sale and purchase of said property. Which copy is marked S, No. 1.

The answer further says, the whole square, as advertised, was not sold at public auction, there not having been made therefor an adequate bid, according to the judgment of the said Fite, and accordingly the lots and improvements thereon were separately sold; and the prior sale of the lot on the south-east corner of Baltimore and Liberty streets, to the complainant, was confirmed, according to the written terms thereof before mentioned, by the receipt, at public auction, of the bid of the complainant therefor, at the sum of twenty thousand dollars. The adjoining lot and improvements were, at the same time, sold at public auction to John Hurst for the sum of twenty thousand and fifty dollars; and a few days after said sale the said Hurst assigned his purchase, and all benefit thereof,

to the defendants, Myer, Samuel, Daniel and Solomon Stein, co-partners, trading as Stein & Brothers.

It is likewise stated in the answer, that in conformity with the terms of the last mentioned sale, the said Fite executed and delivered to the said Hurst a certificate of his purchase, wherein the terms of sale and the boundaries of the property sold were distinctly and accurately set forth, in these words, to wit: "Beginning on the south side of Baltimore street, at the distance of eighteen feet, six inches east from Liberty street, and running thence south about forty-two feet, as the line is located upon a plat of the entire property, recently prepared by Owen Bouldin, surveyor; then south-westerly by a straight line about eighty-two feet, seven inches, more or less, along the eastern walls of the warehouses, fronting on Liberty street, to the four-story brick warehouse on Liberty street, now owned by C. R. Fite," &c., &c.

A copy of which certificate of sale, marked S, No. 2, is filed with the answer as part thereof.

Further answering the defendants say, that, by virtue of said assignment of purchase by said Hurst to them, (the said Myer, Samuel, Daniel and Solomon Stein,) they became the owners of said property. That upon the entire property, (known as Congress Hall,) at the time of these purchases, the buildings were old and dilapidated, and the large prices agreed to be paid therefor were owing chiefly to the value of the lots, and not the improvements thereon. That it was contemplated by the sellers, that whether the property should be sold in bulk or in parcels the old and dilapidated buildings would be torn down by the purchasers, to make room for more modern and substantial improvements; and the division thereof was made in reference to such contingencies. Accordingly, as will be seen by comparison of the two written *memoranda* of sales, one to the complainant and the other to the respondents, Stein & Brothers, the division line between them was made to run with the improvements as they then stood; no more ground on the one hand having been sold to the complainant than was covered by the improvements occupied by Schwartz & Dix; and the western line of the lot sold to Hurst being made to run

along the eastern wall of the warehouses on Liberty street, and of course, therefore, along the eastern wall of the improvements upon the lot occupied by Schwartz & Dix and purchased by the complainant. And the respondents further say, that immediately after they, (Stein & Brothers,) purchased the lot and improvements sold to Hurst as aforesaid, they proceeded, in conformity with their design in the purchase of the same, to tear down the improvements for the purpose of erecting on the lot a modern and substantial store and warehouse, of nearly the entire depth of their lot, for the purpose of their business, which is a wholesale clothing business. That they made with the respondents, Messrs. H. & J. Reynolds, (builders,) a contract for the building of said store and warehouse, and before proceeding to excavate or build, they caused the line of their lot to be carefully and distinctly surveyed and located by Bouldin, the surveyor, who made the plat, according to which the sales of the various lots were made by said Fite. That the lines of their lot were properly located with reference to the description thereof, contained in the written agreement between Fite and Hurst; which lines were strictly and carefully observed and followed in the building put upon the premises, up to the time of making the answer.

"The respondents admit it to be true, that, as they have built, as of right they might do, along the eastern wall of the warehouses on Liberty street, they have encroached upon a triangle (marked yellow) upon a plat filed with the complainant's bill; but they deny that in so doing they have encroached upon any rights of the complainant, no part of said triangle having been purchased by the complainant, and all easements therein, in reference to water and light, being subordinate, (if any such exist, which these respondents do not admit,) to the superior rights of these respondents, (Stein & Brothers,) in reference to the improvements of their property."

The answer likewise denies that there is appurtenant to the complainant's lot any prescriptive right to throw the water from his spouts or eaves upon the lot of the respondents, all such water going naturally and conveniently, as it ought to do, into Liberty street. It also denies, "that there are any ancient

lights appurtenant to said lot and improvements of the complainant, which are darkened or shut up by the improvements now being made by these respondents, all such lights, (if any there be,) being of recent date; and the entire improvements of the complainant being naturally and conveniently lighted from its front upon Baltimore and Liberty streets.''

The defendants deny, generally and particularly, all averments contained in the bill, in reference to damage and injury to the rights of the complainant by the building then being erected by them. They also deny the existence of any prescriptive or other right, upon the part of the complainant, to keep open windows or to throw water from his roof or spouts, upon the lot purchased by them, in such wise as to interfere with the improvement of their property, in the mode in which they were then improving it.

The following is the copy of the written agreement between the complainant and C. R. Fite, referred to in the answer as "S, No. 1:"

"I have this day purchased from C. R. Fite, administrator of Conrad Reineker's estate, the lot and improvements on south-east corner of Baltimore and Liberty streets, occupied by Messrs. Schwartz & Dix, fronting on Baltimore street 18½ feet, more or less, by 73 feet, more or less, on South Liberty street, subject to the annual ground-rent of $4.44, for which I hereby agree and bind myself, my heirs and assigns, to pay him the sum of twenty thousand dollars, one-half of the purchase money, say ten thousand dollars, to be placed on permanent ground-rent of 6 per cent. per annum, payable quarterly from date of sale; and four thousand dollars, to be placed on ground-rent at 6 per cent., redeemable within five years from this date, interest payable quarterly; and the balance, say six thousand dollars, payable one-third in cash; the balance, say four thousand dollars, payable in three equal payments, say 6, 9 & 12 months, with interest from date; notes to be given for the several payments, with interest as above; this sale to be null and void in case the whole square, as advertised, shall be sold together, otherwise to remain in full force.

Witness my hand and seal this April 20th, 1854.

          Signed,     T. F. CHERRY,  (Seal.)"

"Witness:—C. H. Gist."

The following is a copy of the advertisement of sale referred to in the proceedings, and as published in the newspapers:

" *Valuable site for a new Hotel on Baltimore street.*—Old Congress Hall square will be offered at public sale on this day, 20th inst., at 4 o'clock, p. m., on the premises, that valuable square of ground, with improvements, embracing twenty stores and dwellings, occupying the entire square bounded by Baltimore, Sharp, German and Liberty streets, fronting ninety-three feet on Baltimore street, and the same on German street, by 188 feet on Sharp and Liberty streets, the whole subject to a small ground-rent of about $25. Being one of the most valuable and eligible squares in the city for a first-class hotel, in the heart of the business part of the city, and convenient to the Baltimore and Ohio Railroad depot. If the entire square is not sold together, a part of it will be sold in lots, viz:

"No. 1. The lot and three-story warehouse, south-east corner of Baltimore and Liberty streets, 18½ feet on Baltimore street, by 73 feet on Liberty street, *widening on* Liberty street to 35 feet, occupied by Schwartz & Dix, confectioners.

"No. 2. Lot and three-story warehouse, 22 by 35 feet, on South Liberty street, adjoining the above.

"No. 3. Lot and two-story warehouse, 22 by 35, adjoining the above on South Liberty street.

"The whole of lots Nos. 1, 2 and 3, subject to a small ground-rent of $4.44.

"No. 4. The lot and three-story warehouse, on Baltimore street, next to the south-east corner of Baltimore and Liberty streets, fronting on Baltimore street 26½ feet by about 120 feet deep, occupied as two stores and dwelling. Subject to a small ground-rent of $4.44 per annum.

"No. 5. The lot and two-story store and dwelling, No. 9, North Liberty street, east side, 5 doors above Baltimore street, fronting 21 feet on Liberty street, running back to Little Sharp street 85 feet, occupied by a merchant tailor. Ground-rent $1.25 per annum.

"*Terms:* One-third cash, the balance in 6 and 12 months, with interest and approved notes.

"All the Congress Hall square and improvements may be placed on ground-rent, except $30,000, payable as above, one-third cash, balance in 6 and 12 months, with interest.

"C. R. FITE, Administrator."

"*Cannon & Matthews,* Auctioneers."

Upon the bill being filed an injunction was issued. After the answer came in, testimony on both sides was produced; and upon the defendants' motion an order dissolving the injunction was passed by the court, on the 23rd of October 1854, from which the complainant appealed.

The first question to be examined is, whether Cherry, by the sale to him, acquired a title to the *small triangle* claimed by the defendants as included in the sale to Hurst, on which they have placed their wall, and is described on the plat filed with the complainant's bill as being "colored yellow."

In speaking of the two parcels of property, one of which was sold to Cherry, and the other to Hurst, and by him to Stein & Brothers, the former will be called lot No. 1, and the latter lot No. 4, these being the numbers by which they are designated in the advertisement.

From the proceedings and proof it will be seen, that the entire property known as "Old Congress Hall" was advertised to be sold on the 20th of April 1854; the whole square to be sold without division if it could, but if not, then a part would be sold in lots; which lots were described, being numbered from 1 to 5 inclusive. This advertisement was signed by "C. R. Fite, administrator," without saying administrator of whom.

Prior to the public auction, but on the same day, Cherry and Fite entered into the private agreement which has been mentioned as "S, No. 1." After Cherry had signed this instrument the entire square was offered at public sale, but was not sold. Subsequently, lot No. 1 being offered at public auction, was struck off to Cherry at his bid of twenty thousand dollars. Shortly after this lot No. 4 was sold to Hurst, who was present when lot No. 1 had been struck off to Cherry.

3    v .11

And subsequently Hurst assigned his purchase to the defendants, Stein & Brothers.

It is conceded, that the limits of lot No. 1, as described in the advertisement, include the disputed triangle, and that the same is also included in the description of lot No. 4, as set forth in the certificate of sale to Hurst, which has been referred to as "S, No. 2."

If both contracts between Fite and. the two purchasers include the disputed property, although the two sales were made on the same day, and only a few minutes intervening, still Cherry, as being the first purchaser, acquired the better title. 5 *Harris*, (17 *Penn.*) *Rep.*, 223. 9 *Bingham*, 305, in 23 *Eng. C. L. Rep.* But the appellees insist, that according to the proper interpretation of the real contract of sale between Fite and the appellant, his purchase did not embrace the disputed triangle. They say he did not purchase his lot according to the description in the advertisement, but according to that set out in the private agreement, in which it is not said the lot should be 35 feet wide. And in view of the evidence before us, we think the appellees are right in supposing that the sale to Cherry did not give him a right to the triangle.

The private agreement seems to have been the actual contract between the parties. It begins by saying: "I have this day *purchased* from C. R. Fite, administrator of Conrad Reineker's estate," &c., and concludes with, "*this sale* to be null and void in case the whole square, as advertised, shall be sold together, otherwise to remain in full force."

Such an instrument constituted a valid and effective sale, subject to become a nullity upon a single contingency, which did not occur. The subsequent offer of the lot at auction, the same day, was quite useless so far as related to a sale between Fite and Cherry. The latter had already bound himself to purchase the property at $20,000.

An unsuccessful effort to sell the square as a whole, and then proceeding to sell it in parcels to different persons, would be quite sufficient to put an end to the only contingency on which the private sale to Cherry was to be null and void, and by the express terms of the agreement would leave it a contract of sale "in full force."

Moreover, Fite, in his testimony, says: "Deponent agreed to sell the corner property to Dr. Cherry for twenty thousand dollars, prior to the public sale, on condition that the entire property should not be sold, which agreement was in writing, and of which Exhibit No. 1, filed by defendants, is a true copy. If the property had brought more at the sale the benefit would have been Cherry's, if less his loss.

"It was offered under this agreement between him and Cherry. This agreement was the agreement of sale between them, the property was sold according to this agreement, and not according to the printed advertisement, because the advertisement prescribed different terms of payment and different description of property." And Fite, as a witness, also says: "Allow me here to say, that it was agreed between us, that the property was to go to public sale, and that Dr. Cherry was to have the benefit of any excess and suffer any loss over the sum agreed to be paid."

If "S, No. 1," be the real contract of sale to Cherry, its terms show that he purchased of Fite, as administrator of C. Reineker's estate; consequently the rational conclusion is that the property belonged to that estate, especially when, as here, no lines or description are given, which necessarily include other property. Nor is there any proof showing the disputed triangle was held by Fité, as administrator of C. Reineker; but, on the contrary, we understand the testimony of Fite, as inconsistent with the idea of his having any authority, as such administrator, to sell lot No. 4, the description of which we have seen includes the triangle.

Exceptions or objections to the testimony of Fite, were made before the justice of the peace who took the testimony under an order of the court, but exceptions were not regularly filed in the court below, as required by the act of 1832, ch. 302. *Cross, et al., vs. Cohen,* 3 *Gill,* 269. The evidence is therefore before us for consideration, even conceding it would have been excluded by exceptions properly filed. *Gibbs vs. Gale & Stranberg,* 7 *Md. Rep.,* 87.

By agreement "the bill and proceeding, and papers in the case of *Cherry & others, vs. Fite & others,* referred to in the

opinion of the judge," in the present case, are admitted here as evidence, to have the same effect as if they had been inserted in this record.

The object of that bill was to confirm the sales of the property belonging to the estate of C. Reineker, made by Fite to the different purchasers thereof; but no reference whatever is made to the sales to Hurst or other persons, who purchased of Fite any portions of the "Old Congress Hall square," not owned by C. Reineker at the time of his decease. The reason for seeking a confirmation of sales of the several parcels of the estate of C. Reineker, appears to have been, because there was a minor interested in that estate.

The sale to Cherry is described in that bill as "the lot and premises on the south-east corner of Baltimore and Liberty streets, fronting on Baltimore street 18½ feet, more or less, by seventy-three feet, more or less, on Liberty street, subject to its proportion of the ground-rent of $7.94, on the whole lot," &c., but the description makes no allusion to the advertisement, nor does it say any thing in regard to widening the lot to thirty-five feet, or to any other width, on Liberty street. The decree ratified and confirmed "the contracts as set forth in the proceedings," and appointed Conrad R. Fite, trustee, "to execute the deeds of assignment and of sublease according to the said contracts." Subsequently to that decree, Cherry went on to perform his contract, in part, by making certain payments, but when others fell due he refused or failed to pay. The trustees then filed a petition in the cause referred to, asking the court to require or compel Cherry to pay in compliance with his contract and the decree. Among other reasons urged by Cherry, in his answer to the petition, why he should not be compelled to fulfil his part of the contract, he alleged that he purchased the lot No. 1, upon the terms set forth in the advertisement; that Fite had refused to comply with the terms of sale as to part of the property, and by conveying that part of the property to other persons, he had put it out of his power to comply with the terms of the sale made by him to the present appellant. The portion of property here alluded to as having been conveyed to other persons, means, of course, the

triangle. Notwithstanding this answer, the court ordered and decreed, that Cherry should pay the purchase money which had fallen due and remained unpaid; which decree has never been reversed or altered.

In view of all the circumstances we do not think the appellant has given sufficient proof to establish the fact, that he purchased the disputed triangle, and consequently he is not entitled to the injunction, upon the ground of his having title to the land itself, on which the defendants have placed their wall.

Conceding it to be true that the defendants were erecting a wall upon their own ground, to which the complainant had neither a legal or equitable title, still, it is said, the injunction should be sustained, because the wall, when finished, would effectually shut up, darken and render utterly useless, certain lights and windows in the back building upon the lot purchased by him, which windows were ancient, and had been used free of any obstruction, for more than twenty years, admitting light and air, across and over the premises now claimed to be owned by the defendants. This right, as being based upon more than twenty years user, was not urged with much earnestness by one of the solicitors for the appellant, but was by the other.

On behalf of the defendants it has been said, the averments in the bill are not sufficient to sustain such a claim. But we deem it unnecessary to inquire into the character of the averments, or the sufficiency of the evidence on the subject; because we do not consider as applicable to the cities and villages in this State such a right to lights, by twenty years user of them, as in some of the American cases has been called the "modern English doctrine." To adopt it would greatly interfere with, and impede, the rapid changes and improvements which are here constantly going on. The question has never been settled by a decision of our Court of Appeals directly on the subject. The only case having any bearing upon it, is that of *Wright vs. Freeman, 5 H. & J.*, 477, where the late Judge Walter Dorsey says, by way of illustration, in regard to the question there under consideration: "So the enjoyment of lights for twenty years, with the acquiescence of the owner of

Cherry *vs.* Stein, *et al.*

the fee of the adjoining ground, is such a decisive presumption of a right by grant or otherwise, unless contradicted or explained, that the jury ought to believe it." There, however, the question was not in reference to lights. The inquiry was, whether from twenty years non-user of a private right of way the jury could presume a release of it? And the court held that the adversary user of a right of way over the lands of another for twenty years, would be a sufficient foundation to presume, that the right originated in grant; and consequently, for the purpose of quieting possession, it must follow that twenty years non-user of the right would extinguish it, by creating a presumption of its release.

Making use of a man's land, without his consent or by authority of law, as a road or way, is such an encroachment upon his property as gives him a right of action for every such act; and if he submits to the user for more than twenty years, without objection, it may well be presumed he has been prevented from objecting in consequence of the user being rightful. It is not the common course of men to submit to having their property appropriated to the constant or frequent use of others, having no authority to do so, and yet take no steps to prevent it. But where A. makes a window in his own house, overlooking the open grounds of B., it is no infringement of the rights, or encroachment upon the property of the latter. Neither is it an act for which he can maintain an action, or resort to any means by which he can compel the former to shut up the window. And yet, under the English rule, if the window remains open and unobstructed for more than twenty years, B. cannot afterwards erect a building on his own land, if it obstructs the light. To prevent such a consequence the rule does not give him any right of action or legal proceeding, but his only remedy is the seemingly ill-natured one of rendering the window of his neighbor useless, by building a wall or other obstruction for that purpose alone, if at the time he has no wish to build a house on his own property. And if the window be of considerable height the expense of obstructing it might be equivalent, or nearly so, to the value of the unimproved or vacant land designed to be protected. The effects

and legal consequences resulting from the user of a way, and that of a light, are so essentially different, we do not perceive the propriety of holding that the twenty years rule which is applicable to the former should also be applied to the latter.

The question was presented and decided in *Smith vs. White,* in Baltimore county court, by Chief Justice Archer, and his associate, R. B. Magruder, judges of much distinction. In their opinion they say, "although the law may now be regarded as settled in England, since the modern decisions there, that notwithstanding the windows, whose obstruction is now contemplated by the defendant, Mrs. White, are not what is strictly called ancient, yet (to use the expression of Tindall, Ch. J., in the case of *Penwarden vs. Ching, Mood & Malk,* 400; *S. C.* 22; *Sargt. & Lowb.,* 340;) they are such as the law in indulgence to lights has in modern times so called, and to which the complainant would have a right if the question now before us were before a court in England; yet we are not satisfied that, upon principle, the common law as it existed at the time of the separation of Maryland from the mother country, and at the adoption of our Bill of Rights, recognized the modern doctrine in England on the subject of lights." They refer to *Wright vs. Freeman,* as the only case in Maryland bearing upon the subject. And in regard to the language of Judge Dorsey, already quoted by us, they very correctly consider it as not of binding authority, because the direct question whether twenty years user would give a right to lights, was not before the court. In the opinion of those two judges, they likewise hold, that the reason upon which the rule, as established in England, rests, is not the same as that which prevails to sustain a defence of adverse possession in ejectment, or presumption of a grant arising from actual adverse occupation of a water course, common, way, or fishery. And they adopt the ruling of the court in *Parker vs. Foote,* 19 *Wend,* 318.

We deem it unnecessary to enter into an elaborate examination of the authorities, because in *Parker vs. Foote,* Judge Bronson has reviewed them, and has given the subject a careful and able investigation. His reasoning, in our opinion, is so correct, that we cannot avoid yielding our assent to the pro-

priety of his conclusion, which is adverse to the view insisted upon by the appellant. The judge says: "There is, I think, no principle upon wich the moderèn *English* doctrine on the subject of lights can be supported. It is an anomaly in the law. It may do well enough in *England*. And I see it has recently been sanctioned with some qualification, by an act of parliament. *Stat.* 2 & 3, *Will.* 4, *ch.* 71, *sec.* 3. But it cannot be applied in the growing cities and villages of this country, without working the most mischievous consequences. 3 *Kent's Com.*, 446, *note (a.)* Nor do I find that it has been adopted in any of the States. The case of *Story vs. Odin,* 12 *Mass.*, 157, proceeds on an entirely different principle." See also *Myers vs. Gemmel,* 10 *Barb.*, 537. *Pierre vs. Fernald,* 26 *Maine,* 436. *Ingraham vs. Hutchinson,* 2 *Conn.*, 597. *Napier vs. Bulwinkle,* 5 *Richardson's Law Rep.*, 311. *Hoy vs. Sterrett,* 2 *Watts,* 331.

Another ground relied on by the appellant, in support of his right to the injunction, is based upon the doctrine recognized in the decision of *Story vs. Odin,* and in 1 *Sumner's Rep.*, 501, *United States vs. Appleton.* According to those cases, if a man is owner of two adjoining lots of land, one of which is vacant, the other having upon it a building with lights overlooking the former, and he sells the latter, without any exception, or any reservation of a right to build on the vacant lot, or to stop the lights in the building sold by him, he cannot afterwards lawfully obstruct those lights. And as he cannot do this himself, so neither can he convey to another the right to do it.

For the purpose of bringing his case within this doctrine, the appellant's counsel insist, that when the lots No. 1 and No. 4 were sold by Fite, the lights in controversy were open and apparent, and consequently the defendants had no right, subsequently, to obstruct them.

From an examination of the authorities on this subject it clearly appears, that that principle is only applicable where the vendor of the house having the lights, was, at the time of sale, not only owner thereof, but likewise owner of the adjoining vacant lot. Now it might be conceded, that the doctrine of

the cases referred to is the law of Maryland, and still it would not sustain the appellant's claim to have his lights protected by injunction. His lot and that of the defendants', at the time of his purchase, were not owned by the same persons. It is true both lots were sold by Fite, but he was acting in the character of an agent or of a representative. And it appears from the evidence, that the parties, for whom he acted as owners of lot No. 4, were not the same as those having an interest in lot No. 1. Some of the parties had an interest in both, but others were part owners of No. 4, without having any interest in the other lot; and so *vice versa.* Under these circumstances the doctrine above stated is not applicable to this case.

The appellant insists that he is entitled to relief by injunction, on account of the injury he would sustain by the erection of the defendants' wall, because it would injuriously interfere with the eaves of his back building and the drainage of water therefrom. The allegation is, that for forty years prior to the sale, the eaves and roof of the back building had projected over the triangle in controversy, and the water falling on said roof had been accustomed to run and drain over the triangle, and the vacant lot adjacent thereto; that the defendants had commenced erecting their wall upon the triangle, in contact with the rear wall of the complainant's back building, which wall if carried up as designed would interfere with and prevent the projection of said eaves and roof, and the drainage of water therefrom, to the great damage of the complainant's lot, buildings and improvements.

If A. erects a house immediately on the line which divides his land from that of B., and the eaves of the house are made to project over the land of the latter, this is a manifest encroachment upon his property, and an appropriation thereof to the use of another, to the extent of the projection, at least. And twenty years acquiescence by B. in the encroachment, without objection, or taking any steps to prevent its continuance, should be considered sufficient to lay the foundation for presuming a grant. *Law of Easements, top pages* 39, 121, 122 & 123, *(Ed. of* 1840.*)* The principle we have recognized, in

regard to the user of lights for twenty years, does not apply to such a case, but that which is applicable in relation to ways and other analogous subjects, must be the appropriate rule with reference to the question now under consideration.

The next inquiry is, whether the complainant, by proof, has shown himself entitled to relief by injunction, on account of the injury to the eaves of *his* house and the drainage of water therefrom, apprehended by him, if the wall commenced by the defendants should be erected.

When the bill was filed and the injunction issued the wall of the defendants was not up, but only commenced, the top of it then being far below the eaves of the complainant's building. The answer positively denies the right of the complainant to throw water from his spouts or eaves upon the lot claimed by the defendants; and insists that all the water from his roof and eaves, should naturally and conveniently pass into Liberty street. It also denies "any right of the complainant to throw water from his roof or spouts, upon the lot purchased by the defendants, in such wise, as to interfere with the improvement of their property, in the mode in which they are improving it."

It is deemed proper to say that in reference to how far the wall would, or would not, affect the eaves, we are not at liberty to consider as evidence, what is stated in the opinion of the judge below to be his belief, based upon his own inspection of the premises.

There is evidence showing that the water from the roof and eaves of the complainant's back building had, for a long time, been discharged over the lot now held by the defendants. And some of the witnesses testify that the water which had been so discharged could not, conveniently, be made to pass off over the complainant's lot into Liberty street, but others say there would be no difficulty in doing so; one of them being Samuel Dryden, a witness for the complainant, and who lived upon lot No. 1, as a tenant, for many years prior to, and at the time of the sale, and when he was examined as a witness.

After a careful examination of the evidence contained in the

record, we think it does not show, with sufficient certainty, to what extent the erection of the new wall, if carried up as designed, would interfere with the eaves, or whether such interference, would inflict, upon the rights of the complainant an important and irreparable injury, or such an injury as could not be fully compensated by an action at law, but required the interposition of a court of equity to give full and adequate relief.

The injunction was dissolved on the 23rd of October 1854. The appeal was taken on the 28th of December following, and sent to the Court of Appeals on the 6th of April 1855; no appeal bond being given.

It is conceded on both sides, that after the dissolution of the injunction the defendants completed their wall. The precise nature and degree of injury sustained by the complainant, if any, in consequence of the erection of the wall, may now be fully ascertained; and the circumstances disclosed by the proof do not, in our opinion, show a clear case, urgently demanding a reversal of the decision below for the purpose of restoring the injunction. But we consider it more appropriately a case in which the complainant should be left to such redress in a court of law.

In *Amelung & others, vs. Seekamp*, 9 *G. & J.*, 472, the opinion of the court commences by saying: "In *Snowden vs. Noah*, 1 *Hopkins' Ch. Rep.*, 353, it is stated as a general principle, that the writ of injunction is a most important remedy; but it is only used to protect rights which are clear, or at least free from reasonable doubt." The court also express their concurrence in the views of Chancellor Kent, in *Jerome & others, vs. Ross*, 7 *Johns. Ch. Rep.*, 315, "that an injunction is not granted to restrain a mere trespass, where the injury is not irreparable and destructive to the plaintiff's estate, but is susceptible of perfect pecuniary compensation, and for which the party may obtain adequate satisfaction in the ordinary course of law. It must be a strong case of trespass, going to the destruction of the inheritance, or the mischief is remediless to entitle the party to the interference by injunction."

The *Attorney General vs. Nichol*, 16 *Ves.*, 338, was a case

in which the object was to restrain the erection of a wall above sixteen feet in height, the erection of which would obscure and darken the ancient lights of the *Scottish Hospital.* Lord Eldon held there might be cases of that class in which a court of equity could not interfere, and yet an action on the case might be maintained. He based the authority to relieve by injunction, upon the ground of material injury, and of that special and troublesome mischief requiring the application of a power to prevent, as well as remedy an evil, for which damages, more or less, would be given in an action at law. Speaking in reference to this view of Lord Eldon, Chancellor Kent says, in *Van Bergen vs. Van Bergen,* 3 *Johns. Ch. Rep.,* 287, "I have had occasion frequently, since I have been sitting in this court, to allude to this very doctrine, and to consider it as sound." And in Lord Eldon's decision we find him saying, "I repeat the observation of Lord Hardwicke, that a diminution of the value of the premises is not a ground; and there is as little doubt, that this court will not interpose upon every degree of darkening ancient lights and windows." See also *Crabb's Law of Real Property,* secs. 475, 476, 477 & 478, in 54 *Law Lib.* 2 *Waterman's Eden on Injunction,* 269, 270, (3 *Ed.*) *Fishmongers' Co., vs. East India Co.,* 1 *Dickens' Rep.,* 163 & 164. *Ray vs. Lynes,* 10 *Alaba.,* 65. *Hamilton vs. Ely,* 4 *Gill,* 34.

In the case of "*Society for Establishment of Manufactures vs. Morris Canal Company,*" *Saxton's Ch. Rep.,* 192, the Chancellor of New Jersey, says: "The power of the court to grant injunctions in cases of nuisance will not be questioned. . . . . . . But the exercise of the power must always rest in the sound discretion of the court, to be governed by the nature of the case. The case presented is peculiar; but it does not satisfy me of that pressing necessity, or that certainty of mischief which would authorize an interference in a matter of such magnitude."

In *Adams' Equity,* top page 487, *in a note,* (*Ed.* of 1855,) the principle stated is, that to authorize the court's interference by injunction, there should appear imminent danger of great and irreparable damage, and not of that for which an

action at law would furnish full indemnity. In support of which doctrine numerous American authorities are cited.

Viewing the evidence, as it is before us, in connection with well established principles in regard to injunctions, we think the order dissolving the injunction in this case should be affirmed. And the decision having been made on a motion to dissolve and not upon final hearing, the cause will be remanded.

*Order affirmed, and cause remanded.*